Is U.S. v. Juvenile. Council. Good morning, your honors. May it please the court, my name is Timothy Scott on behalf of the appellant Christian O. Your honor, there's two primary reasons why we're asking that this adjudication of delinquency be reversed. First, governments detained and interrogated this juvenile in contravention and in violation of the Juvenile Delinquency Act. And second, the evidence showed only that at most the juvenile was merely present and was not an active participant in his father's crime. First, as to the statements, the government correctly acknowledges that the government agents detained and interrogated the juvenile in violation of 18 U.S.C. 5033. The seven hours that he was held until 2.20 a.m. is virtually unprecedented in terms of length of delay prior to taking statements. The only question remaining is whether or not there's prejudice, whether or not reversal is appropriate under these facts. What I would submit to the court is under this court's statutory analysis, we need only determine whether the violations were a cause of the In United States v. RRA, this court looked at a four-hour delay and said that after four hours, it is fair to presume that isolation from family, friends, and an attorney would at a bare minimum be a cause of the confession. If those facts are true under four hours and it is at least a cause, then certainly under seven hours, under these facts, with his father being the only guiding hand in this interrogation, then at a bare minimum, the violation is a cause of the confession, and as a consequence, reversal is appropriate. The second argument that we wanted to address has to do with mere presence. Taken as a whole, all around, Christian O., even if his statements did come into evidence, was merely present during the commission of his father's crime. There's only a couple ways that a passenger in a vehicle can incur criminal liability for riding along at the port of entry. One of them is through possession, actual dominion and control of the contraband. In this case, there's no evidence to show possession, dominion, or control. In United States v. Ramirez, this court looked at a very similar fact pattern and held that a passenger does not have possession, dominion, or control when there's no fingerprints on the contraband, when they have no particular control of the vehicle, when they're not a driver, when they're not the registered owner of the car. All of those facts fall in line here. Christian Ortiz had just turned 17. His father was the registered owner of the car. His adult cousin who was in the car also had a driver's license. The father had a driver's license. The adult passenger had a driver's license. Christian O. had only an ASB card. There was no evidence he had ever driven that car, nor that he could drive the car. Additionally, Christian O. was not to be paid, whereas the father and the adult cousin were to be paid for their endeavor. So taking it all around, in terms of possession, Christian O. simply didn't. If you were to succeed on this argument, this would lead to a reversal, a vacating of the conviction. Yes, Your Honor. And retrial would be barred by double jeopardy. Is that your question? I'm asking a question. I don't know about double jeopardy. I was supposed to. Well, I suppose the Court could reverse and say that evidence was simply insufficient with instructions to dismiss. I thought that's what you were arguing, insufficiency. Correct, that there simply was not sufficient evidence. You're not arguing that there was a bad jury structure or anything like that. What you're saying is there was not enough evidence to support conviction of the crime. Correct. And it's black-letter law that if we reverse on that ground, there's no retrial. Absolutely correct, on the retrial. I'm sorry, I misunderstood. I'm wondering why you're hesitating. No, I misunderstood the Court's question. I thought that the Court was asking whether I had already raised a double jeopardy claim. But no, absolutely, if the Court determines that there is insufficient evidence and reverses for that reason, the government would not be permitted to try again and to add evidence. That would be barred by double jeopardy, I agree. Okay. So that's the preliminary to my question. Yes. What would be the remedy if you should fail on your second claim but succeed on your first claim? The remedy, for all intents and purposes, would be very similar. If the Court were to reverse and say that the statements should have been suppressed, what the government would be left with is to have to excise the statements from their case. And absent Christiano's incriminating statements, the government would not be able to do that. Are there incriminating statements? Well, the government presented them that way and the district court interpreted them that way. The premise of our second argument is that even assuming every word that he says is true. You have to straddle a difficult line in saying there was prejudice to make your first argument, right? Well. And therefore, if they were not incriminating, if they were irrelevant, then you would really say that your first argument is false. Well, to the extent that the district court relied on those statements and interpreted them in ways as to suggest. The answer really is I assume you don't know what would happen, whether the government would retry them without the statements or not. That's not your decision. If the statements are stricken, that's the government's decision to make, whether there's enough evidence to retry them. I suppose that the government could attempt to get statements from. That was my question. Assuming, let's say you don't prevail on your second claim. You prevail on your first claim. Do we then run a sufficiency analysis minus the statements? Say it works as a statement. We now look at the remainder of the evidence, and we know that the admissible evidence does not support the conviction. Yes. Take away his statements. There's nothing but presence. And then saying that then creates a double jeopardy bar for a second trial? Or do we simply excise the say this should have been excluded and remand for a trial? I think that the Court ought to excise the statements and then analyze the sufficiency. I don't agree with you. If we excise the statements, the government has a right to try them another time and introduce whatever evidence they have, including new evidence. We don't decide in advance that they don't have enough evidence to retry them. That's not our function. We just strike the illegal evidence. And that's the end of our role if you prevail on point one. I think that that probably is the Court's prerogative. That probably is the law as to an adult. I seem to recall that in a juvenile context, because of the public policy considerations in protecting juveniles and in ensuring compliance with the Juvenile Delinquency Act, I would argue that the Court does have discretion to either reverse or to dismiss. I think it's described in the Wendy Gee opinion and the RRA opinion as a prophylactic safeguard to ensure that the juvenile's rights, juvenile rights in general, aren't neglected or eroded. And so to send a message to ensure that these rights are taken seriously and to ensure compliance with them, I think that the Court is still at liberty to reverse and then with instructions to dismiss. But you may be right. All right. I'd prefer to reserve my two minutes with the Court's permission. Okay. Thank you. Good morning, Your Honors. I'm Ann Perry. I'm with the U.S. Attorney's Office in the Southern District of California representing the United States. Mr. Scott and I were the litigants in this case. And I would start with addressing the 5033 issue. Do you agree, by the way, with the last statement, that if we were to decide that the confession, if you called it that, or the statements, whatever statements he made were to be stricken, that we could then proceed and decide whether the case should be dismissed? I don't, Your Honor. I believe that in a situation like this, it could be remanded with instruction to the district court to decide what we're going to do next. Maybe it could be, but I think Judge Reinhart was asking a different question, not could we remand with instructions. Could we also remand with an order to dismiss? Do we have that discretion? Mr. Scott is correct in the assertion that there are certain public policy issues relating to prosecution of juveniles within the Federal system. And there have also been cases that I've seen over the years from this circuit where there are directions to dismiss based on insufficiency of the evidence or directed judgment of reversal. I don't see it in this case. Based on insufficiency of the evidence, obviously, if that's the basis of the decision. But are the insufficiencies of the evidence based not on the evidence admitted but on the evidence that we decide should have been admitted? Your Honors, it would be the government's position that this Court should and can remand this to the district court. No, no, I know we can. The question is, can we, if we wanted, do what we could not do in an adult case, which is say the evidence is stricken and we're now going to evaluate the case without that evidence, and we're going to make a ruling that there's insufficient evidence once that is stricken? We can't do that in an adult case, can we? It was my understanding with regard to this Court's prior decisions that it is not the province of this Court to evaluate the remainder of the evidence. And I don't know that there is a difference between juvenile cases and adult cases in that regard. While there may be some public policy issues, yes. However, in terms of actual evaluation of the evidence and the decisions of this Court, evaluating the remainder of the admissible evidence, I think not. All right. Then you want to get on to the merits of you wanted to discuss first the issue of whether, well, you concede there was a violation. Yes. So the question is whether that was a cause of the statement, statements? It would be the government's position that it was not. And I would list various factors to the Court. And the record is very clear in this case, I think factually, as to what happened. Some of the things that the Court may wish to take into consideration are points that have already been brought up. First of all, who is it? Am I correct that it's the government's burden to show that it is not a cause? That is correct, Your Honor. How do you say that if there's a 7-hour delay or so with a juvenile held at night in a jail cell who is disturbed, upset, that the delay, you can show, carry the burden of showing that the fact that he agreed to make the statement was not, that the detention of 7 hours was not a cause of that? I think evaluating the actual evidence in this case, Your Honor, the rulings that were made by the district court were appropriate for the following reasons. First, Christianeau was not, as in some of the prior cases of this circuit, a very young juvenile. He was 17 years old. Second, he was somewhat familiar with what was happening. In other words, in this case, unlike — this case presents a very unique factual scenario, as I'm sure the Court would acknowledge, in that his co-defendant was his father. The other co-defendant was a cousin. This case has a situation where, unlike the other cases where this Court was concerned about a juvenile's isolation from the family, inability to contact a family member, all of those other aspects of 5033 do not exist. His father was there. They actually cut against it. I mean, if you can't get a hold of the parents, then you can't get a hold of the parents. But here the father is right next door. The father — he's talking to the police. So you don't really have any excuse for not telling him, getting his consent, or telling him the rights. You don't say, well, we didn't have time. We didn't have any officers sent out. We didn't know where they were. They're out partying. They could have been — you know, we couldn't find them. You know, all of those things go by the wayside. You've got Dad right there. So this factor, as you say, cuts against you. Perhaps, Your Honor. However, the procedure — I don't know why you're listing factors that cut against you. I thought you were going to tell us factors that cut for you. This — I believe that it cuts for us, Your Honor. Well, how did it cut for you? They weren't together in the same room. They weren't together in the same room. They might as well have been in different buildings or in different countries. It's not like they could talk to each other. Were they sort of allowed time to sort of commune with each other? They were allowed to communicate with each other. After 7 hours. After 7 hours. Well, not during that time, right? That is correct. So the fact that they were in close physical proximity helps you not at all. They didn't have cell phones. They didn't — were they banging on the wall and exchanging messages that way? They weren't. They weren't. So the fact that they happened to be in the same building helps you not a bit. It only hurts you. It hurts you because it provides no excuse for the government not to have contacted the father and done what it was supposed to do. It didn't have to go fetch him. It didn't have to spend officers' time trying to find him. It didn't have a problem of trying to get him to come in or whatever, right? All of those things fall by the wayside. The officers were operating under the assumption that they needed to determine what their case was going to be against the juvenile. I think that's pretty clear from the record in this case. They were wrong. They were wrong. That doesn't cut in your favor either, the fact that your officers don't know what they're doing. Well, nor does it — nor as I understand the law is it a reason for delay that you want to complete an investigation before you advise him of his rights. You're supposed to tell him immediately of his rights. That's absolutely true, Your Honor. But then it's supposed to be done by the arresting officer. It wasn't done here either, right? It was not done. They were supposed to tell the father. They were supposed to tell the mother. Any efforts made to tell the mother? There were efforts made to tell the mother, but the — After 7 hours. Right. Okay. Look, here and after when I ask these questions, I'm talking about before 7 hours. Just so I don't have to repeat myself. Any efforts to find the mother? Not before 7 hours. Okay. Okay. Any — why wasn't the — so you've got your violation. It wasn't done by the arresting officer. Right. It wasn't untimely. Right. It didn't involve both parents. Correct. And they didn't tell him at all. But, you see, you've conceded there's a violation. So the question that I asked you a while ago was how do you carry a burden of showing that the violation is not a cause of the fact that he decided to talk? Because of what — of how the statement was actually made, Your Honors. By the time the agents got to him, there is no evidence in the record other than the statements of the juvenile himself that were made during his — during the suppression hearing prior to the trial that he was ill, that he didn't understand what was going on, he was cognizant, he talked casually with the agents, he seemed sad and tired because he must have been after 7 hours. But there's no evidence in the record that this is — What time was it? What time was it? 2 o'clock in the morning. And this is a — Any surprise he was tired? This is a young man — Do you think it's clearly at 2 in the morning as you do at 7 in the afternoon? Not necessarily, although this is a young man who said that his bedtime was at least at 10 o'clock. Excuse me? His bedtime was 10 o'clock. 10. So we're only 4 hours off. Well, 17-year-old to go to bed as early as 10. Right. And did the district court make any finding when he said that he had been ill and upset and cried and threw up? Did the district court make a finding as to the truthfulness of those statements? Not a specific finding, Your Honor. He did find that the statements had been made voluntarily under the circumstances. Well, that's really a legal conclusion. So there is evidence that he was upset. He threw up. He was disturbed. But even without that, I mean, I don't — just the fact that you're held for seven hours in jail for something that you claim you're a witness to. Why wouldn't that — if you have a burden to show that's not a cause, it would seem that the likely thing would be that a detention of that length would have some effect on your agreeing to talk. If you're going to be held indefinitely in jail, that you would talk. But I would think — you know, I think it's a difficult burden to carry for the government, but I'm still not sure how you do it once you concede the violation and then have a burden to show that it didn't play a part. I can't say anything else but that this discussion didn't take place until seven hours because that's what the facts are. It doesn't even — it doesn't matter what the reason was. But at the time that the discussion took place, had there been full compliance with that? Had he been told all the things he needed to be told? Had his father been told everything? Yes, Your Honors. And also, the father and son had had the opportunity to meet. As part of the record, you can see that the father actually signed off on the advice of rights form. There was a conversation between the two before the juvenile spoke to the officers. Over time already, thanks to us. But I do want to hear your quick summary of what the evidence is that you think is sufficient to justify his conviction. What's your — could you just summarize what you think the evidence is? Yes, Your Honors. First, that he admitted he knew that there were drugs in the car. Yes. He saw them loaded in the car.  He even indicated that he knew that they were a type of crystal. Yes. He indicated to the agents that he was very sorry and would never do this again. Yes. In terms of his access to the drugs in the car, he had the same equal access that anyone else, since he knew where they were loaded. And they were actually hidden in a place in the car where any member of the — any passenger or the driver would have had the same access or amount of difficulty because they were actually hidden in a place in the car. He did make a negative declaration. The question, according to the record, Your Honor, is, was he bringing anything from Mexico? Correct. Was he bringing it? And he said, no, he wasn't. He wasn't. Yes. How does that help the government? It helps the government in that he knew that they were bringing something. Now, to the extent — Are they asked, are the people with you bringing something? I don't remember those customers' forms. They ask — They usually ask for a receipt. They ask you, are you bringing something? According to Inspector Yanos, who testified — Was he supposed to look in the pocket of the guy next to me on the plane and see whether he's bringing something? No. But they did ask, are you bringing anything? Everybody said no. What if the guy next to me is bringing in a, you know, not contraband, but maybe, you know, some electronic equipment? Am I supposed to report that? Am I complicit if I don't? No. But you are not — perhaps if it was in the plane in which you were riding — The guy next to my luggage, he puts it up there, and I notice that it's an expensive piece of electronic equipment that I happen to know is taxable if you bring it to the United States. It's sort of customs. Am I supposed to declare for him? I'm not bringing anything, but the guy in seat 3B is bringing in this — am I committing some crime if I don't report him? Well, perhaps if you have the knowledge that Christian O. did, that on prior occasions they had gone down to Mexico and — Well, he knew that his father was bringing it. There's no doubt about that. The question is, are you committing, I guess, a violation of 1001 or whatever, making a false statement to a government official? If there are four people in the car and one is transporting drugs and the others know it, are they all — are the other three making false statements when they say that they are not bringing something? Not necessarily according to the law of the circuit, Your Honor. But I do think that in this case, this is where the family — You can't really get very much help from his statement, no, I'm not bringing anything in. I mean, you keep listening to the brief. You listen today. He says, oh, you know, he said he wasn't bringing anything in. But at most — at best, it's neutral. At best, it helps you not at all. Conceivably, it harms you. The other statement you rely on a lot, I gather, is that he says, I'm sorry, I won't do it again. Correct. Because I know a lot of people are sorry about things they did that are not necessarily criminal acts. That's true. So why does that — is that so significant, that he finds himself in jail because he didn't disclaim his father or disavow his father's act or refuse to go along? If it's not a crime, he could still be sorry. I mean, for his going along and watching, if it's not a crime, he could still be sorry and say, I'm not going to do it again, couldn't he? That statement, I think, was significant also in light of his other admissions of having gone down there previously and being involved with drugs and his father. This was not the first time he'd done it. There's no doubt about that. Did he say that on prior occasion he was selling stuff? He did not. He said that he went down with his father. I'm sorry, sir. Did he say he was transporting stuff? He said that he went down with his father and there was one time when he sat down. I think that's important.   I don't think that's the way to look at it. You have to look at it and say because I admit I've done it before, how does that now make it guilty? Having done an innocent act more than once doesn't accumulate to make it guilty, does it? Not necessarily. Well, certainly in the admissions curriculum. What does necessarily mean? You know, we're talking about inferences here, okay? So tell me, if I do something that's innocent, you know, I go to synagogue, right? Sure. Okay. And it turns out I've gone to synagogue in the past. I admit I've done it many times in the past. Does that sort of accumulation of innocent acts add up to a guilty act? Not necessarily. It doesn't. There's a problem that we have here. Let me see. What I'm asking the question is can you create, you see, not necessarily, so just in some way it could. Correct. Can you take a succession of innocent acts and create from them an inference of guilt? Not necessarily. I realize you could create an inference going the other way, but show me how you would deduce an inference of guilt by having a series of innocent acts. I guess in this particular case, or do you want me to extrapolate? Because in this case, the government doesn't view these as innocent acts, clearly. Well, you could take the position, look, we don't believe him. We don't believe him. You know, he says I was just a rider. We think the jury is entitled to believe that he, in fact, was involved in the transaction. And you can certainly take that position. But then you have to bring proof. And you said, well, here's our proof. He did exactly the same stuff before. He did exactly. But if this act standing by itself is not enough to prove guilt, how is proving that he did exactly the same thing in the past, how does that accumulate to proof of guilt? Your Honor, in this case, Christian not only said that he had gone down there four times before or three times before, whatever it was that he said, but actually elicited on cross-examination during the fact-finding portion of this trial. The agent indicated that Christian had told him that he had seen money transacted, that drugs had been picked up in a black Denali, some sort of vehicle. There's no doubt he knew it was a crime. I mean, I don't think they deny that he knew it was a crime. And the question is, did he participate or was he just a witness to it? You know, if he was held in jail for seven hours and put in handcuffs and didn't know when he could go home, and let's assume all he did was witness it, I would think it would be a reasonable thing for him to say, I'm sorry, I won't do it again, I shouldn't be around and watching crimes and go along for the ride. But I think what Judge Kaczynski says is true. The argument is, well, a jury can infer from that, not that he was saying, I'm sorry, I got into this trouble and I won't do it again. If the cop had said to him, you know, stay away from crimes, he would have said the same thing. I'm sorry, I won't do it again. But I suppose you could argue to the jury that one inference is that he committed a crime when he said, I'm sorry. The way the finder of fact Judge Whalen viewed this is that Christian's role in this case was as window dressing to show the happy family going back and forth across the border. That's clear in his comments when he adjudicated him to be a juvenile delinquent. And I think based upon the subsequent sentence that the juvenile received, which was, I think, commensurate with what the district court viewed his role in this case to be, that that was at least one way of looking at what Christian was doing in this case. Not that he was just going down and he knew what was happening, but that he knew that they were bringing back drugs into the United States. He was there as the son to show a hand of rule. What if he had been 8 rather than 17? I'm sorry? What if he had been 8, 8 years old rather than 17? Thankfully, he would not have been prosecuted in Federal court. Excuse me? Thankfully, he would not have been prosecuted in Federal court. Why not? Well, I realize that 7 is at least the last time I checked. 7 was the cutoff. But our Federal system has so little facilities for juveniles. I'm asking you a question of law. And you want to talk to me about prosecutorial policy. Let's say you find... Would he have been prosecuted? And he says the same thing, you know, four times since the age of 7. My dad told me, get in the car. And I get in the car. And I knew there were drugs there. I knew my father was involved in illegal activity. But my dad said, get in. So I got in. I did what my dad told me to. And now I'm sorry I didn't. And, you know, an 8-year-old is much better at window dressing than a 17-year-old, right, if you're going to do that kind of thing. He's still guilty? He may be. He could be. In this case, though, I think the difference is he is 17. And there is 9 years' difference. But he hasn't done anything differently than the 8-year-old as far as the government has proven. They don't show that he concealed the stuff, that he loaded the stuff, that he owned the stuff, that he lied about the stuff. There's nothing of the sort. Every question he was asked, he answered. I mean, you don't dispute the answers that he answered. I can't. Excuse me? I can't dispute the answers. Well, then, good thing you don't. It's a good thing you don't, then. Sometimes we deal with the hand we've been dealt with. And I think that that's what this case is. Well, I think that's a good closing. All right. Okay. Thanks very much. Thank you, Your Honor. Your Honors, I'll be very brief, absent any further questions from the Court. With regards to the equal access argument that Christian O. was in possession because he could access the drugs as well as anyone else could, that runs counter to the Ninth Circuit's approach to a passenger possessing contraband. In Ramirez, the Court held that that is not possession. And, in fact, in the Ramirez case, the contraband was smuggled in a spare tire, which presumably everyone in the car could have equal access to. So I suggest that there's not legal support for that argument. Do we know where in the vehicle the drugs were? I have the impression they were in the back seat with him. They weren't inside the car at all. That's clear from the record. They were concealed within the doors underneath panels in the sides of the vehicles. Excuse me, in the side of the vehicle on the side of the doors. I'm sorry. I guess I had the impression they were sort of like panels. Like if you were in the back seat, you could move aside the panel. Or does the panel mean that you have to actually take off sheet metal? I'm not sure the record reflects it very clearly. I imagine that a person could probably get into it without taking off actual metal. As the car is moving without actually getting out and using a blowtorch. I don't know whether a person could do it when the door is closed or whether the door would have to be stopped and open and stationary in order to remove the paneling. I don't know the answer to that question. The record doesn't reflect it. But in any event, it was not lying on the back seat. It was not lying on the back seat. Certainly Christian Oh himself didn't have any drugs or money on his person. And again, I say that if the drugs were in a spare tire, that's equally accessible to everyone in Ramirez. The car had better stop. The car would have to stop. But the record doesn't show that you could do it while the car is moving in this case either. Okay, fair enough. And then as to the window dressing argument, I would respectfully submit that that argument somewhat begs the question because Christian Oh never said that he understood his role was to be window dressing and he had signed on because he was providing an appearance of a family. His father never said that that was Christian Oh's role. The adult cousin never said that that was Christian Oh's role. There's no evidence that says that there was any agreement or any suggestion that Christian Oh or even the other family members of that family. It's a fair inference. It's a fair inference that that was the father's purpose. And I would submit that I'm sure that's exactly what the father had in mind by bringing Christian Oh along. It's a different inference to suggest that Christian Oh himself cognitively decided I'm here to be window dressing because certainly he didn't make any statements like that to the agents and the evidence doesn't support that. So with that, I would submit absent any other questions. Thank you, counsel. Thank you, Your Honors. All right. The case just argued will be submitted. The next case for argument is United States v. Rodriguez. On two separate occasions prior to trial, Mr. Ron Hell moved the district court to appoint him new counsel due to what Mr. Ron Hell had described as a serious conflict and lack of communication between himself and his attorney. The first motion was made approximately two months before trial. That motion was referred to the magistrate judge and was denied by the magistrate judge. The second motion was made the morning of trial. That motion was denied directly by the district court. I'd like to start with the second motion that was made by Mr. Ron Hell. I believe that's the more egregious violation by the district court in denying that motion. This court considers three factors when looking at the propriety of a denial of a substitution of counsel motion, the timing of the motion, the adequacy of the district court's inquiry, and the nature of the conflict, the problem between the attorney and his client. When you look at the district court's denial of Mr. Ron Hell's motion for new counsel in the morning of trial, it's crystal clear from the record that the only factor the district court considered was the fact that it was brought at a late time and that it was going to inconvenience the court. Well, it actually, he considered two things. He considered the fact that he was bringing it on the same grounds that had been brought
judges: Reinhardt, Kozinski, Clifton